# CHARLESTON

BURKHEIMER v. BLAKE *et al.*

Submitted January 16, 1912.     Decided October 22, 1912.

FRAUD—*Fraudulent Representations—Sale of Merchandise.*
     The judgment below, in an action on the case for damages sustained by plaintiff by the fraud and deceit of defendants, in obtaining from him a stock of goods and merchandise, is supported by the evidence, and is affirmed on familiar legal principles.

Error to Circuit Court, Cabell County.

Action by William M. Burkheimer, Jr., against A. G. Blake and another.     Judgment for plaintiff, and defendants bring error.

*Affirmed.*

*Vinson & Thompson* and *Marcum & Marcum,* for plaintiff in error.

*Switzer & Wiatt* and *Holt & Duncan,* for defendants in error

MILLER, JUDGE:

In an action for damages against Blake and Bromley for alleged fraud and deceit plaintiff recovered a verdict and judgment for three thousand dollars, and defendant Blake complains of that judgment.

The declaration, in substance, charges that plaintiff being the owner of a stock of merchandise in the City of Huntington, of the value of thirteen thousand dollars, defendants fraudulently combined and confederated to cheat and defraud him, and pursuant thereto solicited plaintiff to sell them his stock of goods upon the terms that an inventory thereof should be taken, the value ascertained, a discount of twenty per cent. deducted therefrom, and that Bromley should purchase and take three thousand dollars worth of the goods, and pay therefor by his individual notes, one for one thousand dollars at four months, and one for two thousand dollars at six months from date, and should pledge to plaintiff as collateral security therefor two twenty year guaranty gold trust bonds of the Realty Banking ·& Trust Company, of the face value of one thousand dollars ·each, and that the defendant Blake should take the remainder of the goods, and pay therefor in cash and notes. That in furtherance of their fraudulent purposes, defendants falsely and fraudulently represented to plaintiff that they intended to form a co-partnership, of which Bromley was to be general manager, that Bromley was financially responsible; and that the bonds ·of the Realty Banking & Trust Company were genuine and valuable and would furnish ample security for the payment of his notes; that James W. Hughes of Huntington, who was financially responsible, was indebted to Bromley fifteen hundred dollars, which would fall due at or about the time of the maturity of the first note and out of which Bromley would pay the same.

It is further alleged that these representations were wholly false, and known by defendants to be false when made, and that they were made for the purpose of obtaining three thousand dollars worth of goods from plaintiff upon the worthless notes and securities of Bromley, and when acquired to turn them over to ·Blake for a small or no consideration, and with-out just compensation to plaintiff; that plaintiff being ignorant of the falsity of said representations, believed them to be true and relied thereon, and was thereby induced to accept said proposition, and that between the 2nd and 12th days of February, 1909, sold and delivered said goods to defendants, and ac-cepted the notes and collateral securities of Bromley for his

share of the goods, and from Blake the notes and cash agreed
to be paid by him for the goods he agreed to take, and that in
consummation of the fraud and conspiracy Bromley immediately
turned over to his confederate Blake his interest in the goods,
the latter paying him for his services three hundred dollars.

It is also alleged that Bromley, at the time of his purchase,
was and still is insolvent, and that his notes, past due at the
time of the suit, and the bonds given as collateral security, are
without value, and that plaintiff had been defrauded and cheated
out of three thousand dollars worth of his goods as aforesaid,
and for which he asks damages.

Briefly stated, the alleged fraudulent representations were,
that defendants proposed to form a co-partnership, of which
Bromley was to be general manager; second, that Bromley was
financially responsible, and that the bonds of the Realty Bank-
ing & Trust Company were genuine and valuable and ample
security for the payment of Bromley's notes; third, that Hughes
was indebted to Bromley fifteen hundred dollars, maturing when
the first note of Bromley would mature and out of which that
note would be paid.

On the trial below the contract between the parties was
proven to have been in writing, substantially as alleged in the
declaration, but this contract contains no reference to any co-
partnership to be formed, except what may be inferred from
the character of the purchase, and contains no representations
as to the value or genuineness of·the bonds of the Realty Bank-
ing & Trust Company, nor any reference to the alleged in-
debtedness of Hughes to Bromley, or that Bromley expected
or would out of that indebtedness make payment of the first
note, and the last paragraph of said contract is: "It is further
understood and agreed that these are two separate and distinct
sales, and that said Blake shall be in no way responsible for the
purchase made by Bromley, and said Bromley in no way re-
sponsible for the goods purchased by said A. G. Blake."

The trial was had in the court below on the issue joined on
the plea of not guilty by both defendants, but Blake alone has
assigned error in this Court.

It is contended here on Blake's behalf that there is no proof
of the fraud and conspiracy alleged, and that the evidence wholly

fails to establish that the several alleged false representations were in fact made, or if made, that they were in fact false, or made to induce plaintiff to part with his goods, or that plaintiff relied thereon, or that any fraud was committed.

We will consider these alleged false representations in the order named, with the evidence bearing thereon, keeping in mind the charge that the ultimate objects of defendants were to procure the goods purchased in the name of Bromley for the benefit of Blake, without just compensation, and to defraud plaintiff.

First, as to the proposed partnership. Burkheimer alone swears that such representation was made. Bromley, whom plaintiff made his witness, was not asked and did not testify, either on direct or cross examination, that either he or Blake represented to plaintiff that a partnership was to be formed by the purchasers. Blake did not testify in the case. Besides Burkheimer's evidence, the character of the purchase was such as to imply a proposed partnership; at least there was nothing in the singleness of the purchases described in the contract to negative the positive testimony of Burkheimer, and as neither Bromley nor Blake denied the positive evidence of Burkheimer, the jury had the right to believe Burkheimer and find accordingly.

But if false, was the representation material? We think it was material in this, that as Burkheimer was to part with three thousand dollars worth of goods to Bromley, with only two thousand dollars of bonds as collateral, he would naturally rely on the interest Bromley was to acquire in the partnership as additional security for the payment of his notes. If Burkheimer had known, as Bromley admits in his testimony, that he was acting for Blake and intended immediately on obtaining possession of the goods to turn over his interest therein to Blake for one hundred and fifty, not three hundred dollars, as he swears he did, and that Blake was to get the goods, for which Bromley had obligated himself to pay three thousand dollars, for this nominal consideration, he evidently would not have made the sale to Bromley. We think the jury had the right to conclude from all the evidence that there was fraud and collusion in this repre-

sentation and that the plaintiff relied thereon, and was damaged thereby.

Second, as to the Realty Banking & Trust Company bonds: Did defendants falsely represent them to be genuine and valuable, and did plaintiff rely upon this representation? Plaintiff so swears, and Bromley does not distinctly deny that such representation was made, but he qualifies his tacit admission, as a witness for plaintiff, by saying, that he gave it as his opinion that the bonds were genuine and valuable, but that he told the plaintiff he could investigate the bonds for himself, and that he turned them over to him for that purpose. Burkheimer admits that he took the bonds to his banker, who consulted the blue book, and gave it as his opinion from information derived from the book that the bonds were good. Burkheimer admits also that before he concluded the contract and parted with his goods a message of inquiry was sent to the Realty Banking & Trust Company, the principal in the bond, at Washington, D. C., and that he received a reply that the bonds were O. K. He still insists, however, that he relied upon the representations of the defendants. But the question remains, was the representation false? No witness swears that the bonds were not genuine and valuable. Plaintiff relies mainly on a volunteer statement of his own, made on cross examination, not responsive of the question, and which was objected to at the time. He was being interrogated about a conversation with Mr. Hughes regarding the alleged indebtedness of Hughes to Bromley, and he was asked when this interview took place; he answered, that "It was along about the 12th and 2nd day of February, some where along about that time, may be a little later *when I found out that the bonds were worthless.*" Plaintiff had not testified previously, on direct or cross examination, that he had found out that the bonds were worthless. The time he mentions was about the time he was consulting his banker and got the telegram, which was dated February 10th, assuring him the bonds were all right. The home of this bond company seems to have been in Washington, D. C. If the bonds were worthless that fact could easily have been shown, and it ought to have been shown, and not left to mere inference, as the record of this case has left it. There is, however, some evidence in the case of

a discrediting character.   Hambrick, the broker, through whom
these bonds were obtained corroborates Bromley, that three hun-
dred dollars was to be paid for the use of these bonds; that they
did not belong to Bromley, but were only loaned to him, and
he swears, that of the three hundred dollars raised by Bromley
on a note of Blake to pay for the use of the bonds, but one
hundred and seventy-five dollars was paid to him, the rest
being retained by Bromley for some purposes of his own.   Brom-
ley swears he did not get the bonds directly from Hambrick,
but from two other persons to whom Hambrick had previously
pledged them for small sums of money borrowed, which were
adjusted or paid, when he obtained the bonds.   Who was to
get the three hundred dollars premium for the use of the bonds
does not appear.   Presumably the company thus lending its
credit would be entitled to the premium.   But if the telegram
of the company to Burkheimer was genuine, it recognized the
right of Bromley to the bonds and to dispose of them to Burk-
heimer, as he did, and who still has them.   What the value of
these bonds is, is not otherwise shown.   The jury could hardly
have found from all the eivdence that they were not genuine and
valueless, or that the representations respecting them were false.

Third, as to the indebtedness of Hughes.   The plaintiff is
the only witness who swears to this representation.   He is flatly
contradicted by his witness Bromley.   But if the representation
was made, and made the basis of credit, and was relied on by the
plaintiff, it does not clearly appear that the representation was
false.   An attempt was made to prove the falsity of the repre-
sentation by plaintiff himself.   He testifies that he saw Hughes
and asked him about the matter, and places the time between
the 2nd and the 12th of February, but he does not pretend to
swear what Hughes said about the matter, and the question is
left in that indefinite and uncertain state.   The only other
evidence relating to the subject, or on which the jury may have
inferred that Hughes was not indebted to Bromley, is the lat-
ter's admission on the witness stand, that he was only worth at
the time of the trade from one hundred and fifty to two hundred
dollars.   Why he was not examined specifically about this
Hughes indebtedness, we cannot understand.   It is almost cer-
tain, however, that if Bromley was worth only one hundred and

fifty to two hundred dollars at the time of his purchase from Burkheimer, Hughes could not have been indebted to him fifteen hundred dollars.

An absorbing fact, however, in connection with this whole transaction, and which must have been uppermost in the minds of the court and jury trying the case, is the undisputed fact that Bromley, immediately after the purchase of the goods, turned over his interest to Blake, the latter paying him but one hundred and fifty dollars for his services, leaving Burkheimer, who had parted with three thousand dollars worth of his goods to Bromley, with nothing but the worthless notes and doubtful securities pledged therefor. Both notes were past due when this suit was brought, and not a dollar had been paid upon them, and Bromley, according to his confession, was execution proof. Naturally twenty year bonds of the character of those pledged as security had little, if any, market value at the place where they were pledged. The jury and court were justified, we think, in concluding, whatever value the bonds may have, that the purpose of the whole transaction upon the part of Blake and Bromley was to get three thousand dollars worth of plaintiff's goods for Blake without compensating him therefor.

For the fraud and conspiracy alleged, and to the extent proven, and as found by the jury, and upon familiar legal principles, not necessary to reiterate, we are of opinion the judgment below should be affirmed.

*Affirmed.*